IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HEATHER P.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, Commissioner of Social Security[2] | : | NO. 25-2653 |

**MEMORANDUM AND ORDER**

CAROLINE GOLDNER CINQUANTO, U.S.M.J. September 30, 2026

Plaintiff filed this appeal from the Commissioner's decision denying her application for disability insurance benefits ("DIB"). For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on February 14, 2022. Tr. at 149, 240.[3] She alleges disability beginning on February 26, 2021, as a result of anxiety, depression, post

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using her first name and last initial. See Standing Order – In re: Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]Frank Bisignano was appointed Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Bisignano should be substituted as the defendant in this case. No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

[3]In order to be eligible for DIB, Plaintiff must establish that she became disabled prior to the expiration of her insured status or date last insured ("DLI"). 20 C.F.R.

traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), Celiac Disease, Hashimoto's Disease, pernicious anemia, panic attacks, light headedness, and fatigue. Id. at 149, 240, 312. Plaintiff's application was denied initially, id. at 151-52, and on reconsideration. Id. at 169-70.

On November 18, 2022, Plaintiff requested an administrative hearing. Tr. at 173-74. After holding a two-day hearing on December 15, 2023, and April 11, 2024, id. at 50-69, 90-131, the ALJ issued an unfavorable decision on May 24, 2024. Id. at 21-40. The Appeals Council denied Plaintiff's request for review on March 25, 2025, id. at 1-3, making the ALJ's May 24, 2024 decision the final decision of the Commissioner. 20 C.F.R. § 404.981.

Plaintiff sought review in federal court on May 23, 2025, Doc. 1, and the matter is now fully briefed. Docs. 8, 11-12.[4]

## II. LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable

---

§ 404.131(b). Here, the Certified Earnings Record establishes and the ALJ found that Plaintiff's DLI is December 31, 2026. Tr. at 23, 149, 308.

[4]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 4.

mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1. Whether the claimant is currently engaged in substantial gainful activity;
>
> 2. If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3. If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

> 5. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 404.1520(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III. DISCUSSION

### A. ALJ's Findings and Plaintiff's Claims

In her May 24, 2024 decision, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of February 26, 2021. Tr. at 23. At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease ("DDD") of the cervical spine, major depressive disorder ("MDD"), bipolar disorder, generalized anxiety disorder ("GAD"), obsessive-compulsive disorder ("OCD"), an eating disorder, autistic disorder, attention deficit hyperactivity disorder ("ADHD"), and posttraumatic stress disorder ("PTSD"). Id. at 24. At the third step, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." Id. at 25. The ALJ found that Plaintiff has the RFC to perform light work, except she can understand, remember, and carry out simple instructions; occasionally interact with supervisors, coworkers, and the public; and deal with occasional changes in a routine work setting. Id. at 29. At the fourth step, the ALJ found that Plaintiff is not capable of

performing her past relevant work as a special education teacher, a learning differences teacher, and a special education manager. Id. at 37. Based on the Plaintiff's age, education, experience, and RFC, a vocational expert ("VE") testified that Plaintiff could perform the jobs of non-governmental mail clerk, office helper, and retail stock clerk. Id. at 39. Based on this testimony, the ALJ found that Plaintiff was not disabled. Id. at 39, 126. As a result, the ALJ found that Plaintiff was not disabled. Id. at 39.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because (1) the finding that Plaintiff can constantly reach, handle, pinch, grip, and finger is not supported by the medical record evidencing upper extremity limitations, (2) the ALJ failed to proper evaluate the treating opinion evidence, (3) the ALJ failed to discuss evidence regarding Plaintiff's ocular issues and headaches, (4) the ALJ erroneously relied on Plaintiff's activities of daily living to justify her RFC assessment, (5) the ALJ failed to consider evidence relevant to the determination of the "C criteria" in considering the mental health listings, and (6) the ALJ improperly relied on her lay interpretation of the evidence. Doc. 8. Defendant responds that the ALJ's decision is supported by substantial evidence and the ALJ properly considered the opinion evidence and Plaintiff's activities of daily living. Doc. 11. Plaintiff filed a reply arguing that the ALJ failed to consider conflicting evidence and how she resolved evidentiary conflicts. Doc. 12.

**B. Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on October 17, 1972. Tr. at 97. She obtained a master's degree in 2018, and has teaching certifications in early childhood, elementary, and special education. Id. at 97-98. She has past relevant work as a special education teacher, third-

grade resource room teacher, and autistic support teacher. Id. at 99-101. Plaintiff was 48 years old when she alleges she became disabled on February 26, 2021, and 51 years old at the time of the ALJ's May 24, 2024 decision. Id. at 97.

At the hearing, Plaintiff testified as follows.[5] She stopped working in February of 2021, due to a decline in her mental health and increase in symptoms. Tr. at 98. She received Family Medical Leave for a period in 2021, and long-term disability in 2021 and 2022. Id. at 98-99. Plaintiff explained that changes in temperature affect her extremities such that her hands, toes, ears, and nose will feel numb in the cold. Id. at 112. She also suffers from carpal tunnel syndrome ("CTS"), for which she was prescribed wrist braces. Id. at 115. CTS hampers her ability to walk her dog on the leash, clean the litter box, grasp things, carry bags, and use the computer. Id. at 105, 115-16.

In addition, Plaintiff testified that she has neck pain that radiates from her neck to her fingertips and from her neck to the base of her spine. Tr. at 57. She described a burning feeling in her upper arms, heaviness and weakness in her arms and legs, and pain and pressure in her shoulders causing pain in her upper and lower back. Id. The pain in her neck is worse when she turns to the side or looks down. Id. Plaintiff has pain in her hands with movement and use and explained that lifting or twisting causes pain, but driving, using the computer, holding the phone, and writing cause a tingling or numbness.

[5]The original hearing was held on December 15, 2023, at which time Plaintiff and the VE testified. Tr. at 90-131. The ALJ held a supplemental hearing on April 11, 2024, at Plaintiff's request. Id. at 52-69.

Id. at 58.[6] She was no longer able to make bracelets with her teenage daughters because she had difficulty stringing the beads and looking down caused her neck pain. Id. at 60. For the pain in her hands, she rests her hands. For pain in her neck or back, she has to lie down. Id. at 58-59.

Plaintiff explained that her mental health impairments, including anxiety, ADHD, autism, and PTSD, cause her to fear authority-type figures and over-explain and defend her positions. Tr. at 117-18. She has difficulty remembering things and is also easily distracted and unable to stay on-task. Id. at 110, 118, 122. Although her ADHD medication is helping, she complains of difficulty sleeping because thoughts "pop into [her] head." Id. at 118. She also suffers from situational panic attacks 2-3 times a week, during which her chest tightens, heart races, lips tingle, and she gets shaky and has trouble breathing. Id. at 64. Plaintiff lacks motivation due to her depression, which causes her to fail to complete chores. Id. at 67.

A VE also testified at the administrative hearing. Tr. at 123-30. The VE characterized Plaintiff's jobs as a special education teacher, learning differences teacher, and special education manager as skilled, light work. Id. at 124. Relevant to the decision, the ALJ asked the VE to consider someone of Plaintiff's age, education, and background, who could perform light work, with the other limitations contained in the ALJ's RFC assessment, see supra at 4. Id. at 125-26. The VE testified that such an

[6]Plaintiff's testimony concerning the use of her hands is somewhat inconsistent. She stated she could write for 30 seconds to a minute before she had to stop using her hands, but also stated that she could write for 10 to 15 minutes. Tr. at 58.

individual could not perform Plaintiff's past work but could perform the jobs of non-governmental mail clerk, office helper, and retail stock clerk. Id. at 126. The VE clarified when questioned by Plaintiff's counsel that an individual who had to be retrained or redirected daily would not be able to perform the identified jobs. Id. at 129. Additionally, the VE testified that if the person was limited to occasional handling, reaching, and fingering, there would be no work at the sedentary level. Id. at 130.[7] Despite this, the ALJ found that Plaintiff was not disabled based on the VE's testimony. Id. at 39.

**C. Medical Records**

For ease of discussion, I will review Plaintiff's treatment for her physical and mental health impairments separately, but recognize that there is significant overlap as her mental health impairments also manifest as physical symptoms and her primary care provider oversaw her mental health treatment at times.

1. Physical Impairments

a. Treatment Providers

Plaintiff has a history of Celiac Disease, gastritis, irritable bowel syndrome ("IBS"), hypothyroidism, fatigue, insomnia, headaches, Lyme Disease, and pernicious

---

[7]The VE was not asked how such manipulative limitations would impact work at the light level. Tr. at 129-30. It appears that the jobs identified by the VE require frequent use of the hands. See https://occupationalinfo.org/20/209687026.html (mail clerk), https://occupationalinfo.org/23/239567010.html (office helper), https://occupationalinfo.org/29/299667014.html (retail stock clerk) (last visited Aug. 14, 2026).

anemia. Tr. at 695. A blood test on April 16, 2021, was positive for Lyme Disease. Id. at 646.

On May 13, 2021, Plaintiff reported to Nadia Ali, M.D., at Functional Holistic Healing, that she had been sick at Christmas, after which she developed significant fatigue, brain fog, and headaches. Tr. at 690-91. On June 9, 2021, Plaintiff continued to complain of brain fog, intermittent headaches, trouble remembering things, and feeling exhausted. Id. at 688. On August 20, 2021, Plaintiff complained to her primary care physician, Mallory Harlin, D.O., about intermittent chest pain, headaches, brain fog, and fatigue, which Dr. Harlin noted as physical manifestations of anxiety. Id. at 622. Dr. Harlin prescribed low dose Lexapro.[8] Id. at 626.

On March 24, 2023, Plaintiff treated for the first time with Nancy Rist, M.D., of Main Line HealthCare Primary Care. Tr. at 2009. At that time, Plaintiff had a normal physical exam. Id. at 2012-13. The doctor noted that the diagnosis of pernicious anemia was suspect because Plaintiff's B12 level was high without supplementation. Id. at 2014. On August 31, 2023, Chrystine Palomba, CRNP, in Dr. Rist's Office, noted that Plaintiff had been bitten by a tick in March and treated with doxycycline.[9] Id. at 2035. Plaintiff complained of increased fatigue, tightness in her neck and shoulder, right hand CTS, her hands and feet being cold, blurry vision, sharp pain in her foot, feeling clumsy, and joint

[8]Lexapro (generic escitalopram) is an antidepressant. See https://www.drugs.com/lexapro.html (last visited Aug. 14, 2026).

[9]Doxycycline is an antibiotic. See https://www.drugs.com/doxycycline.html (last visited Aug. 14, 2026).

pain in her shoulders, knees, ankles, elbows, and wrists. Id. at 3035, 2037. On examination, NP Palomba noted that Plaintiff had 5/5 strength in all extremities with no significant swelling of the finger or toe joints. Id. at 2038. NP Palomba ordered lab work. Id. at 2039. The blood work was negative for Lyme Disease, but Plaintiff had a positive Antinuclear Antibody ("ANA") screen.[10] Id. at 2047-48.

On September 15, 2023, Plaintiff saw gastroenterologist Nikkita Dharbhamulla, M.D., for chronic constipation. Tr. at 1497. Dr. Dharbhamulla requested Plaintiff to keep a food diary and that she continue eating fiber and add kiwi fruit to her diet and ordered lab work relating to Plaintiff's Celiac Disease. Id. at 1500.

On September 28, 2023, Plaintiff saw rheumatologist Thais Moldovan, M.D., following up on her abnormal autoimmune tests. Tr. at 1964. She complained of frequent headaches, blurry vision, joint pain, and worsening CTS, which makes it "hard

---

[10] An ANA test is a blood test that looks for antinuclear antibodies in your blood. Antibodies are proteins that your immune system makes to fight foreign substances, like viruses and bacteria. But an antinuclear antibody attacks your healthy cells instead. It's called "antinuclear" because it targets the nucleus of the cells, which is in charge of sending signals that are needed for important cell functions.

> It's normal to have a few antinuclear antibodies in your blood. But a large number may be a sign of an autoimmune disorder. If you have an autoimmune disorder, your immune system attacks the healthy cells of your organs and tissues by mistake.

See https://medlineplus.gov/lab-tests/ana-antinuclear-antibody-test/ (last visited Aug. 7, 2027.

to pick up a pitcher sometimes." Id. Dr. Moldovan's joint examination was normal with normal range of motion, normal joint stability, and muscle strength 5/5 in upper and lower extremities. Id. at 1965. The doctor noted that "[p]hysical examination was unremarkable." Id. at 1966. On October 30, 2023, Plaintiff followed up with Dr. Moldovan, complaining of "joint pain traveling from the hands to the elbows and shoulders." Id. at 1970. A joint examination was normal and Dr. Moldovan counseled Plaintiff that the positive ANA test by itself "does not indicate that you have an underlying autoimmune disease." Id.

On November 16, 2023, Plaintiff saw Daniel Lorenzana, M.D., at Premier Ortho and Philadelphia Hand to Shoulder, with complaints of elbow pain, right greater than left, right shoulder pain, bilateral thumb base pain, and left hand thumb and finger numbness and tingling. Tr. at 2908. On examination, the doctor noted tenderness over the tendons on the outer side of the elbow, pain in the wrists, and grinding at the base of the thumb. Id. The doctor diagnosed bilateral lateral epicondylitis,[11] thumb CMC osteoarthritis, and expressed concern regarding bilateral CTS. Id. Dr. Lorenzana referred Plaintiff for occupational therapy with stretching and strengthening exercises, wrist orthoses, and topical anti-inflammatory medication. Id. In addition, if the left-hand numbness continued, he would recommend an EMG study. Id. X-rays of the elbows were normal

---

[11]Lateral epicondylitis is "an overuse injury of the lateral humeral epicondyle at the elbow, due to inflammation or irritation of the area where the common extensor tendon attaches to it." Dorland's Illustrated Medical Dictionary, 33rd ed. (2020) ("DIMD"), at 623.

and x-rays of the wrists showed "very small osteophyte formation" at the base of the thumbs. Id. at 2909.

Plaintiff began occupational therapy on November 18, 2023. Tr. at 2534-35. She reported weakness and difficulty holding things. Id. at 2528 (11/30/23). Plaintiff participated in weekly occupational therapy through mid-January 2024. See id. at 2896 (11/30/23), 2888 (12/8/23), 2883 (12/14/23), 2878 (12/29/23), 2868 (1/9/24) 2863 (1/15/24). Dr. Lorenzana noted that Plaintiff's symptoms of bilateral lateral epicondylitis had "mostly improved" and her bilateral thumb base pain had "mostly resolved" when he saw her on January 18, 2024. Id. at 2680, 2861. At that time, Plaintiff's main complaint was numbness, tingling, and pain in the thumb through ring fingers of both hands, exacerbated by repetitive activities or prolonged gripping. Id. Dr. Lorenzana noted on examination that Plaintiff had a reduced range of motion of the cervical spine, and "bilateral upper extremity symptoms concerning for [CTS] and cervical radiculopathy. Id. at 2861. The doctor ordered an EMG study. Id.

X-rays of Plaintiff's elbows performed on January 29, 2024 were normal, and x-rays of the wrists showed small osteophyte formations in the joint at the base of each thumb. Tr. at 2920. On February 9, 2024, physical therapist David Hutchinson conducted EMG studies, which showed mild (right greater than left) CTS, and mild right C5-C6 radiculopathy. Tr. at 2856, 2915. An April 9, 2024 MRI of the cervical spine showed moderate central canal narrowing at C3-4 and C4-5, moderate to severe left

foraminal narrowing at C4-5, severe right foraminal narrowing at C5-6, and severe left greater than right foraminal narrowing at C6-7.[12] Id. at 2926.

b. State Agency Physicians

The record does not contain a physical consultative examination. On June 9, 2022, at the initial consideration stage, Alfonso Cuozzo, M.D., found from his review of the evidence that Plaintiff's physical impairments were not severe. Tr. at 132-34. At the reconsideration level on October 24, 2022, Pamela Irene Gianni, M.D., agreed with Dr. Cuozzo. Id. at 142, 146.

2. Mental Impairments

a. Treatment Providers

There are significantly more records related to Plaintiff's mental health treatment in the record. Originally, Plaintiff's primary care physician, Dr. Harlin, oversaw Plaintiff's treatment for GAD, for which she originally prescribed Lexapro, but changed to buspirone[13] to "better target anxiety." Tr. at 612, see also id. at 620 (9/17/21 – stop Lexapro, start buspirone). On October 15, 2021, Dr. Harlin increased Plaintiff's buspirone and recommended a psychiatric evaluation. Id. at 615. The following month,

---

[12]"Foraminal stenosis is a condition that happens when narrowing in parts of your spine causes compression of your spinal nerves." See https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis (last visited Aug. 10, 2026).

[13]Buspirone is an anti-anxiety medication used to treat symptoms of anxiety including fear, tension, irritability, dizziness, and pounding heartbeat. See https://www.drugs.com/buspirone.html (last visited Aug. 14, 2026).

Dr. Harlin noted that Plaintiff was seeing psychiatry and her GAD symptoms were improving with therapy and medication, including buspirone and Wellbutrin.[14] Id. at 731.[15]

Beginning in February 2021 through November 2021, Plaintiff participated in individual psychotherapy with Sopia Park, Ed.S., through Thriveworks. Tr. at 2059-2288.[16] During the sessions, Plaintiff expressed concern about working with the principal at the school where she worked, fear of the Covid virus, parenting issues, and relationship issues with her mother, partner, and children. Id. Ms. Park originally diagnosed Plaintiff with adjustment disorder with anxiety, id. at 2059, but changed the diagnosis to GAD and social phobia in September 2021, id. at 2153, 2160. Plaintiff's mental status exams ("MSEs") were predominantly normal, except for the occasional notation of an anxious or irritable mood and preoccupied/blocking thought content/process. See, e.g., id. at 2075 (4/26/21 – normal MSE), 2077 (5/3/21 – anxious mood), 2087 (6/1/21- normal MSE), 2091 (6/7/21 – irritable mood), 2095 (6/14/21 -

---

[14]Wellbutrin (generic bupropion) is an antidepressant. See https://www.drugs.com/wellbutrin.html (last visited Aug. 14, 2026).

[15]Dr. Harlin left the practice on April 9, 2022, tr. at 729, at which time, Janet Fontanella, D.O., became Plaintiff's primary care provider. Id. at 730. During her treatment of Plaintiff, Dr. Harlin periodically provided notes explaining that Plaintiff could not return to work due to her need for intensive mental health treatment. See id. at 733 (11/16/21), 736 (12/17/21), 740 (1/11/22), 744 (2/11/22), 748 (3/11/22), 752 (4/8/22). Dr. Fontanella continued writing the letters, attesting to the fact that Plaintiff was not ready to return to work due to treatment for "chronic health concerns." Id. at 821 (5/10/22).

[16]Plaintiff saw Ms. Park weekly and then twice weekly from February 2021 to November 2021. Tr. at 2059-2288.

anxious mood, blocking/preoccupied thought process/content), 2101 (6/25/21 – normal MSE), 2115 (7/19/21 – normal MSE), 3135 (8/23/21 – normal MSE), 2160-61 (9/27/21 – normal MSE), 2200-01 (10/18/21 – normal MSE), 2271 (11/12/21 – normal MSE), 2281 (11/15/21 – normal MSE).

During the sessions, Ms. Park rated Plaintiff's functional status. In nearly all of the sessions, Ms. Park noted that Plaintiff's functional status was "Intact." However, Ms. Park noted some mild impairment in the summer of 2021 and again in November 2021, see tr. at 2107 (7/5/21) 2109 (7/9/21), 2111 (7/12/21), 2113 (7/16/21), 2119 (7/26/21), 2123 (8/2/21), 2127 (8/9/21), 2131 (8/16/21), 2251 (11/5/21), 2261 (11/8/21), and moderate impairment at times during the same periods. See 2011 (6/21/21), 2125 (8/6/21), 2133 (8/20/21), 2241 (11/1/21).

Plaintiff began treatment with Trevose-Springfield Psychological on November 4, 2021. Tr. at 2804. Thomas Koste, CRNP, diagnosed Plaintiff with GAD and noted Plaintiff was taking buspirone, added Wellbutrin, and recommended ADHD testing. Id. at 2809. Based on a neuropsychological evaluation conducted in November 2021, Kami Marchese, Psy.D., concluded that Plaintiff suffered from ADHD, GAD, and MDD, and recommended psychiatric consultation and continued psychotherapy to "develop coping strategies to better manage her depression and anxiety." Id. at 2801-02. Mr. Koste added Vyvanse[17] to Plaintiff's regimen and noted Plaintiff's "good response to Vyvanse"

[17]Vyvanse is a stimulant medication used to treat ADHD and moderate or severe binge eating disorder. See https://www.drugs.com/vyvanse.html (last visited Aug. 14, 2026).

on December 28, 2021. Id. at 2787. Through April, 2022, Mr. Koste's monthly treatment notes indicate that Plaintiff had a good response to her medication regimen, and with the exception of an anxious mood, her MSEs were normal. See id. at 2782-83 (1/25/22), 2778, 2780 (2/21/22), 2774, 2776 (3/21/22), 2779, 2772 (4/21/22). In May 2022, Mr. Koste began adjusting Plaintiff's medications and dosages to address Plaintiff's complaints of irritability and problems with concentration. See id. at 2768 (5/17/22 – add Zoloft,[18] discontinue Wellbutrin), 2763 (6/16/22 – decrease Zoloft, add Lamictal[19]), 2758 (7/28/22 - increase Lamictal, add Klonopin[20]), 2754 (8/22/22 – increase Lamictal and Klonopin). Throughout the medication changes, Plaintiff's MSEs were predominantly normal except for an anxious mood.

On June 18, 2022, Plaintiff began weekly psychotherapy with Kerri Marsh, LCPC, to address "issues related to being an adult child of an addict." Tr. at 2290. Ms. Marsh noted diagnoses of GAD and ADHD. Id. at 2307. Plaintiff continued weekly sessions with Ms. Marsh through September 2022, during which her MSEs were normal. Id. at 2289-2516. On August 16, 2022, Plaintiff admitted that one of her strategies for dealing

---

[18]Zoloft (generic sertraline) is an antidepressant. See https://www.drugs.com/zoloft.html (last visited Aug. 14, 2026).

[19]Lamictal (generic lamotrigine) is an anticonvulsant used to treat seizures and to delay mood episodes in adults with bipolar disorder. See https://www.drugs.com/lamictal.html (last visited Aug. 14, 2026).

[20] Klonopin (generic clonazepam) is a benzodiazepine used to treat seizure disorders and panic disorder. See https://www.drugs.com/klonopin.html (last visited Aug. 14, 2026).

with stress was binge eating. Id. at 2433, see also id. at 2480 (9/13/22 – "binge eating has gotten worse over the last several weeks"). The September 27, 2022 treatment notes indicate that Plaintiff would be participating in an intensive outpatient program for her eating disorder. Id. at 2508-10.

On September 19, 2022, Dr. Cooney (at Trevose-Springfield) included a diagnosis of Bipolar II Disorder, found Plaintiff was having ruminations, somatic preoccupation, poor insight, pressured speech, anxious mood, and circumstantial thought processes. Tr. at 2724, 2726. The doctor noted that Plaintiff's "[s]ymptoms are not adequately controlled." Id. at 2726. Dr. Cooney discontinued Lamictal. Id. at 2727. On December 1, 2022, Plaintiff continued to have pressured speech, an anxious mood, circumstantial thought process, and ruminations. Dr. Cooney noted that Plaintiff was teary at times. Id. at 2719-20. Dr. Cooney did not change Plaintiff's medications but planned to add a mood stabilizer. Id. at 2722. On January 25, 2023, Dr. Cooney noted that changes in Plaintiff's group and individual psychotherapy sessions made Plaintiff feel that her support groups were "waning at the same time she is dealing with disability ending and her daughter's father looking to gain custody." Id. at 2713. Dr. Cooney tapered Klonopin and added Pristiq[21] to Plaintiff's medication regimen. Id. at 2713, 2716. For the next several months, Dr. Cooney made no changes to Plaintiff's medications. On March 7, 2023, Plaintiff complained of "difficulty with task initiation and time

[21] Pristiq is an antidepressant used to treat MDD. See https://www.drugs.com/pristiq.html (last visited Aug. 14, 2026).

management." Id. at 2706. On May 1, 2023, Dr. Cooney noted that Plaintiff had been feeling "overwhelmed and fatigued" in the prior weeks but had "leveled out." Id. at 2700. Throughout this period, Dr. Cooney noted that Plaintiff had pressured speech, an anxious mood, circumstantial thought processes, and ruminations.

On July 31, 2023, Plaintiff reported to Dr. Cooney that she was having "difficulty focusing and [with] concentration," and Dr. Cooney noted that Plaintiff's "[f]ood aversion symptoms and binge-eating are becoming more problematic again." Tr. at 2693. Dr. Cooney increased the dosage of Pristiq. Id. at 2698. In November 2023, Plaintiff expressed frustration because she "doesn't feel respected by people with whom she interacts who don't accept or make allowances for her neurodivergence." Id. at 2685. Plaintiff admitted reducing her buspirone because she often forgot to take the nighttime dose and then became dizzy when taking it. Id. at 2685. On MSE, Dr. Cooney noted that Plaintiff was irritable as well as anxious. Id. at 2688. The doctor changed the timing of Plaintiff's Vyvanse and increased Pristiq. Id. at 2691.

Plaintiff has also participated in various group therapies to address her eating disorder, domestic violence, and trauma. See tr. at 2713 (Dr. Cooney discussing Plaintiff's therapy groups); see also id. at 1232-1466 (11/17/21 – 9/22/23 – The Light Program), 1630-1868 (1/19/22 - 10/6/23 – The Light Program), 2812-49 (2/14/24 – 2/16/24 – The Light Program). Plaintiff also sought nutrition counseling from Julie JeBran, R.D.N. See id. at 1516 (10/17/22). Plaintiff saw Ms. JeBran 2-3 times a month until March 13, 2023, and then again on May 26, 2023. Id. at 1516-1505. On August 8, 2023, Stephanie Alberts, Ph.D., saw Plaintiff for atypical anorexia nervosa and

recommended treatment options for her eating disorder and general behavioral support. Id. at 1209.

Several of Plaintiff's mental health providers, including her primary care physician, provided letters indicating that Plaintiff was unable to return to work due to her mental health impairments or completed forms recertifying Plaintiff's status regarding a long term disability policy. See tr. at 2627 (10/15/21 – Dr. Harlin), 2628 (12/17/21 – Dr. Harlin), 2629 (4/8/22 – Victoria Ley, L.C.S.W.), 2630 (5/6/22 – Ms. Ley), 2631-33 (7/7/23 - Amy Rudisill, L.P.C.), 2634-37 (10/19/22 – Ms. Rudisill), 2924 (5/23/21 – Dr. Ali). In addition, Stephen M. Neff, P.M.H.N.P., indicated that he was treating Plaintiff on May 5, 2023, and confirmed a diagnosis of autistic disorder and OCD. Id. at 1206.[22]

b. State Agency Physicians

The record does not contain a consultative mental status examination. At the initial consideration stage on May 16, 2022, John Paul Rohar, Ph.D., found from his review of the record that Plaintiff suffered from depressive bipolar and related disorders,

[22]There are additional treatment notes and test results contained in the record. Tr. at 70-89. Because it was unclear if these records had been properly presented to the ALJ, see id. at 235 (indicating counsel "reattached" these records in his request for review in the Appeals Council), I directed counsel for both sides to clarify the issue. Doc. 13. In response, both sides agree that the additional medical records were not properly presented to the ALJ. See Doc. 14 at 1; Doc. 15 at 2 (arguing the evidence is cumulative). "[E]vidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence." Matthews v. Apfel, 239 F.3d 589, 594 (3d Cir. 2001) (citing Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991)). Thus, this court may not consider the newly-presented evidence.

anxiety and OCD, personality and impulse-control disorders, neurodevelopmental disorders, eating disorders, and trauma and stressor disorders. Id. at 135. Dr. Rohar found Plaintiff had no limitation in her ability to understand, remember, or apply information. He found that Plaintiff had moderate limitation in the abilities to interact with others, adapt or manage oneself, and concentrate, persist, or maintain pace. Id. Dr. Rohar found Plaintiff "is able to meet the basic mental demands to complete 1-2 step tasks on a sustained basis despite the limitations resulting from her impairment. [Plaintiff] can understand, retain, and follow simple instructions (i.e., perform/follow one and two step tasks/instructions)." Id. at 137. On reconsideration on November 4, 2022, Nancy A. Kennedy, Psy.D., found the record supported similar limitations to those found by Dr. Rohar. Id. at 143-46.

### D. Claims

#### 1. Manipulative Limitations

Plaintiff complains that the ALJ ignored several of Plaintiff's upper extremity diagnoses (confirmed by EMG and the treatment notes), which resulted in a RFC assessment that surpassed Plaintiff's capabilities. Specifically, Plaintiff complains that the ALJ's finding that Plaintiff can constantly reach, handle, pinch, grip, and finger is not supported by substantial evidence. Doc. 8 at 6. Defendant responds that the ALJ adequately addressed Plaintiff's manipulative limitations. Doc. 11 at 8.

Although the ALJ acknowledged Plaintiff's upper extremity impairment in her decision, she discounted certain test results by relying on Plaintiff's intact strength and sensation.

> With respect to [Plaintiff's] severe physical impairment, she presented to [Dr.] Lorenzana . . . on January 18, 2024, with complaints of numbness and tingling in her fingers as well as radiating pain from [her] bilateral shoulders ([tr. at 2861]). Although examination was remarkable for painful and reduced range of motion of the cervical spine, positive Spurling's on the right, and positive Phalen's maneuver on the right, [Plaintiff] had 5/5 strength in the bilateral upper extremities and intact sensation to light touch throughout (Id.). Dr. Lorenzana assessed cervical radiculopathy (Id. at 2861). In April, [an] MRI of the cervical spine demonstrated multilevel cervical degenerative changes combined with congenital cervical spinal canal narrowing, moderate to severe left foraminal narrowing at C4-C5, severe right foraminal narrowing at C5-C6, and severe left greater than right foraminal narrowing at C6-C7. (Id. at 2925-26]).

Id. at 34.[23]

In determining the claimant's RFC,

> the ALJ must consider all evidence before [her]. Although the ALJ may weigh the credibility of the evidence [s]he must give some indication of the evidence which [s]he rejects and [her] reason(s) for discounting such evidence. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.

---

[23]Tinel's sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning of regeneration of the nerve." DIMD, at 1687. Spurling's test is performed to detect cervical radiculopathy. "[T]he examiner presses down on the top of the head while the patient rotates the head laterally and into hyperextension; pain radiating into the upper limb ipsilateral to a rotation position of the head indicates radiculopathy." Id. at 1870. The Phalen test is used to diagnose CTS. "[T]he size of the carpal tunnel is reduced by holding the affected hand with the wrist fully flexed or extended for 30 to 60 seconds . . . ; appearance of numbness or paresthesias indicates [CTS]." Id. at 1867.

Pellegrini v. Kijakazi, Civ. No. 22-652, 2023 WL 5751403, at *8 (E.D. Pa. Sept. 6, 2023) (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000)).

In the case at hand, the ALJ did not properly address Dr. Lorenzana's diagnosis of bilateral CTS, tr. at 2861-62, the EMG study confirming mild CTS, id. at 2915, the positive Tinel's sign at the radial tunnel bilaterally, and Plaintiff's significantly reduced grip strength. Id. at 2861.[24] Although the ALJ acknowledged the diagnosis of CTS, she found this impairment to be non-severe. Id. at 24. The ALJ justified this finding by noting that (1) the record did not support any limitations arising from CTS, (2) the impairment was sporadic and not expected to last 12 months, and (3) Plaintiff did not seek further treatment for CTS after her lateral epicondylitis resolved by January 18, 2024. Id.

With respect to CTS-related limitations, on January 18, 2024, Dr. Lorenzana noted "mild pain with bilateral resisted wrist extension" and significantly reduced grip strength. Tr. at 2861. In addition, during a clinical exam at occupational therapy, Lauren DiTullio, O.T., found that Plaintiff's upper extremity impairment caused a "significant" functional impact. Id. at 2534.[25] Plaintiff complained of difficulty gripping and paresthesias

---

[24]Dr. Lorenzana also diagnosed Plaintiff with osteoarthritis of the base joints of her thumbs, which was confirmed on x-rays. Tr. at 2861, 2920. However, on January 19, 2024, Plaintiff reported that "her bilateral thumb base pain [had] mostly resolved." Id. at 2861.

[25]It is unclear how much of the impairment was attributable to bilateral lateral epicondylitis versus CTS. However, OT DiTullio noted on clinical exam that Plaintiff had pain with gripping throughout the upper extremity. Tr. at 2534.

throughout her hand when holding things for an extended period of time. Id. at 2648. She had earlier complained to NP Polomba that her right-hand CTS was getting worse and she was having difficulty opening lids and jars. Id. at 2566. Likewise, Dr. Moldovan noted Plaintiff's complaints of difficulty picking up a pitcher due to CTS on September 28, 2023. Id. at 1964.

Moreover, although it is not entirely clear when Plaintiff's CTS symptoms began, she complained of her CTS "getting worse" on August 31, 2023. Tr. at 2566. She also told Dr. Lorenzana on November 16, 2023, that her thumb base pain had been present for "at least 6 months" and the left hand numbness and tingling had been present for several years. Id. at 2908. Finally, the ALJ states that Plaintiff did not seek further treatment for CTS after her lateral epicondylitis resolved by January 18, 2024. In doing so, he neglects to appreciate that on January 18, 2024, when Plaintiff reported that her bilateral lateral epicondylitis symptoms had "mostly improved," she had "progressive numbness and tingling" in her hands, positive signs for CTS, and significantly reduced grip strength. Further, Dr. Lorenzana sent Plaitniff for an EMG study which ultimately confirmed the diagnosis of mild CTS on February 9, 2024. Id. at 2861, 2915. The ALJ's statement that Plaintiff did not seek further treatment for CTS after January 18, 2024 is specious, considering the timing of the administrative hearing just two months after the EMG study was completed.

Additionally, whether severe or not, it was incumbent upon the ALJ to consider the limitations attributable to CTS in crafting the RFC assessment. See 20 C.F.R. § 404.1523 ("[W]e will consider the combined effect of all of your impairments without

regard to whether any such impairment, if considered separately, would be of sufficient severity."); see also 20 C.F.R. § 1545(a)(2) ("We will consider all of your medically determinable impairments . . . including your medically determinable impairments that are not 'severe' . . . when we assess your [RFC]."). Thus, the case must be remanded for consideration of Plaintiff's CTS-related limitations.

Finally, no treating physician or consultative examiner opined on Plaintiff's physical abilities in light of her impairments. The doctors who reviewed the record at the initial and reconsideration stages did not have the benefit of Dr. Lorenzana's treatment notes, the MRI of Plaintiff's cervical spine, or the EMG testing confirming CTS, nor did they have the benefit of the x-rays confirming small osteophyte formations at the base of Plaintiff's thumbs. Moreover, the inclusion of manipulative limitations would require additional vocational evidence to determine if and to what extent such limitations would erode the occupational base.

2. Remainder of Plaintiff's Claims

Plaintiff also claims the ALJ failed to (1) properly evaluate the treating opinion evidence, (2) properly evaluate the "C criteria" of the mental health Listings, (3) consider relevant medical evidence including that related to Plaintiff's ocular impairments and headaches, and (4) properly characterize Plaintiff's activities of daily living in determining Plaintiff's RFC. As I have already determined that remand is necessary, I will address these only briefly.

Like Plaintiff's physical impairments, no treating physician or consultative examiner has provided a statement detailing Plaintiff's mental abilities in light of her

mental impairments. As discussed in reviewing the mental health treatment notes, Ms. Park, who treated Plaintiff through November 2021, and Mr. Koste, who treated Plaintiff from November 2021 through August 2022, treated Plaintiff for anxiety, and Plaintiff's MSEs were predominantly normal, but for an anxious mood. However, beginning in August 2022, Plaintiff's mental condition seemed to deteriorate. Ms. Marsh noted that Plaintiff was dealing with stress by binge eating, tr. at 2433, see also id. at 2480 (9/13/22 – "binge eating has gotten worse over the last several weeks"), requiring Plaintiff to participate in an intensive outpatient program for her eating disorder. Id. at 2508-10. In September 2022, Dr. Cooney diagnosed Plaintiff with Bipolar II Disorder, found Plaintiff's symptoms were not adequately controlled, made abnormal findings on MSE, and began a series of medication changes and adjustments. See tr. at 2724, 2726.

Unfortunately, Drs. Rohar and Kennedy, who performed record reviews at the initial and reconsideration levels respectively, and upon whom the ALJ relied, did not have the benefit of Dr. Cooney's treatment notes. Dr. Rohar's review predated the Bipolar diagnoses, significant changes in Plaintiff's medications, and Dr. Cooney's treatment of Plaintiff. See tr. at 135 (Initial Review – 5/16/22). Although Dr. Kennedy's record review at the reconsideration level occurred after Dr. Cooney began treating Plaintiff, the evidence of record that Dr. Kennedy reviewed does not include Dr. Cooney's notes. See id. at 141 (no indication of Dr. Cooney's Springfield Psychiatric notes). See Fox v. Bisignano, Civ. No. 24-1651, 2026 WL 1507701, at *4 (M.D. Pa. May 29, 2026) ("In the Third Circuit, courts have found error when an ALJ relies on a medical opinion from state agency physicians that never had the opportunity to consider

'major medical events' that followed the state agency physicians' review.") (citing Cadillac v. Barnhart, 84 F. App'x 163, 168 (3d Cir. 2003)). On remand, the ALJ should further consider the more recent mental health treatment notes and obtain a mental health opinion regarding Plaintiff's mental health related limitations.

I have no need to address Plaintiff's claims further as the ALJ will have to reevaluate the evidence with respect to Plaintiff's physical and mental impairments. See Butler v. Kijakazi, 587 F. Supp.3d 223, 231 (E.D. Pa. 2022) (citing Steininger v. Barnhart, Civ. No. 04-5383, 2005 WL 2077375, at *4 (E.D. Pa. 2005) (not addressing additional arguments because ALJ's findings may be revised after a new hearing)).

## IV. CONCLUSION

The ALJ's decision is not supported by substantial evidence. The ALJ did not properly consider the evidence relating to Plaintiff's CTS and failed to include any CTS-related limitations in the RFC assessment or explain the absence of such limitations. The ALJ also failed to properly consider the mental health treatment evidence. The record contains no assessment of Plaintiff's limitations, physical or mental, by any treatment provider or consultative examiner. The ALJ relied on the State agency record reviewers, who reviewed the records prior to a significant increase in Plaintiff's mental health related symptoms and prior to the EMG and MRI studies evidencing CTS and severe foraminal narrowing in Plaintiff's cervical spine.

An appropriate Order follows.